**UNITED STATES of America,**

v.

**Adam SAVADER, Defendant.**

**No. 13–MJ–359.**

United States District Court,
E.D. New York.

May 7, 2013.

Loretta E. Lynch by: Allen Bode, AUSA, United States Attorney, Central Islip, NY, for Plaintiff.

Michael Soshnik, Esq., Mineola, NY, for Defendant.

## *MEMORANDUM AND ORDER*

GARY R. BROWN, United States Magistrate Judge.

This matter, which came before the Court for a bail determination on April 26, 2013, presents novel factual issues as well as the kind of legal challenges that often arise when applying traditional legal concepts to cases emanating from digital tech-

nology. As described in further detail herein, the undersigned directed that the defendant be removed in custody to face charges in the Eastern District of Michigan. Because the Second Circuit has encouraged courts to create a record in the defendant's home district that may assist the charging district in making further determinations, I am setting forth the rationale underlying that decision in this Memorandum.

## BACKGROUND

The Affidavit for Criminal Complaint, executed in the Eastern District of Michigan, describes the victimization of fifteen young women through unauthorized access to computer systems, extortion and cyber stalking. *See* Docket Entry ("DE") [1] Ex. A ("Affidavit"). In sum and substance, the events described include the hacking of various Internet-based accounts belonging to these victims, including email and social media sites. *See generally id.* The perpetrator apparently gained access to these accounts, using various forms of social engineering to trick the victim into providing him with account passwords. *See, e.g., id.* ¶¶ 9, 22. Using these passwords, he obtained compromising photos of the victims—usually in various states of undress, though in one instance involving a nude photo of a victim's mother[1]—that had either been sent by the victims via private email or otherwise electronically stored in a manner not intended for public access. *E.g., id.* ¶¶ 15, 22, 23.

Once in possession of these photographs, the perpetrator electronically transmitted them by anonymous text message to the victims, usually with threats that the photos would be shared with parents, employ-

ers, boyfriends or other members of the community unless the perpetrator's demands were met. *E.g., id.* ¶¶ 10, 15, 23. Principally, the perpetrator demanded that the victims provide him with additional nude photographs and/or other sexual details about themselves. *E.g., id.* ¶¶ 11, 23. Additionally, he sent victims anonymous texts describing his use of the photographs he already obtained to masturbate. *Id.* ¶ 12.

The anonymous text messages sent to victims not only contained extortionate threats, but were vulgar, controlling and cruel. One victim described that she "felt frightened and terrorized by his comments." *Id.* ¶ 9(c). Another felt "blackmailed" and "alarmed" by the messages, and contacted the police. *Id.* ¶ 3 9(c).

The Affidavit provides specific technical evidence—the details of which are unimportant for this determination—linking the defendant to the computer hacking alleged, which is more than sufficient to establish probable cause. *See generally id.* The technical details are notable, however, in that they demonstrate considerable sophistication with computers. *See, e.g., id.* ¶¶ 16–20 (tying defendant to a web of internet service providers, social media accounts, and telephone numbers from which the threatening messages originated). At the bail hearing, the government proffered that it removed approximately 25 computer devices from the defendant's home. Additionally, the Affidavit presents evidence linking the defendant to many of the victims, with whom the defendant attended high school or college. *See generally id.* Importantly, in one instance, the Affidavit describes a historical obsession the defendant evidenced toward one of the

---

1. In one instance, the photo in question was an older photograph taken when a victim "embraced and kissed her younger sister at a high school party." Aff. ¶ 26. The manner in

which this particular photograph was portrayed by the perpetrator as compromising is not made clear in the Affidavit.

victims several years ago. *See, e.g., id.* ¶ 26(c).

## DISCUSSION

### *Defendant's Right to a Bail Hearing in the District of Arrest*

■ The first question is whether the defendant is entitled to a bail hearing in the district of arrest. One Second Circuit case, decided shortly after passage of the Bail Reform Act of 1984, holds that the detention hearing should usually be conducted in the charging district, after defendant's removal from the district of arrest. In *United States v. Melendez–Carrion,* 790 F.2d 984, 989 (2d Cir.1986), seven defendants charged in the District of Connecticut with armed robbery of a Wells Fargo office were arrested in Puerto Rico. Several of the defendants were ordered detained by a magistrate judge in San Juan. The Court of Appeals held:

> Neither the Bail Reform Act nor Fed. R.Crim.P. 40 governing removal hearings specifies the sequence for a detention hearing and a removal hearing. We agree with the conclusion recently reached by the Seventh Circuit that a removal hearing may precede a detention hearing, leaving the latter normally to occur in the district of prosecution after removal. *United States v. Dominguez,* 783 F.2d 702, 704–05 (7th Cir. 1986). There is no indication that Congress, in specifying that a detention hearing shall occur, absent continuances, upon the defendant's "first appearance" before a judicial officer, considered the context of an arrest in a district other than the district of prosecution. As the Seventh Circuit pointed out, it is highly unlikely that Congress would have wanted detention hearings to occur in districts scattered across the country in which those accused in multi-defendant cases might happen to be arrested. The

decision whether to seek detention and the evidence necessary to support a finding of dangerousness and risk of flight sufficient to justify detention will normally be located primarily in the district of prosecution.

*Id.* at 990. *Melendez–Carrion* emphasized that defendants "were not entitled to detention hearings prior to removal." *Id.* at 991; *cf. United States v. Morris,* No. CRI-MA.00–MG–267, 2000 WL 1455244, at *6 (N.D.N.Y. Sept. 21, 2000) (holding that "the appropriate forum for the detention hearing to be held in this case is in the charging district" and directing the defendant be transported in custody). A later Second Circuit decision read *Melendez–Carrion* as adopting a "flexible" approach, stressing that "a removal *may* precede a detention hearing." *United States v. Coonan,* 826 F.2d 1180, 1185 (2d Cir.1987) (emphasis added).

Subsequently, in *United States v. El–Edwy,* 272 F.3d 149 (2d Cir.2001), the Circuit considered the appropriate venue for reviewing an order of release issued by a magistrate judge in the district of arrest. Without expressly overruling *Melendez–Carrion,* the Second Circuit observed that:

> Rule 40 makes explicit what should in any event be clear in logic. When a person is arrested on the basis of charges pending against him in a different district, the orders of detention or conditional release entered by a magistrate judge in the district of arrest are designed to insure the person's appearance in the district where he is wanted- the district where the prosecution is pending.

*Id.* at 152. *El–Edwy* further notes that this procedure ensures "that the person receives the earliest opportunity to seek conditional release." *Id.* at 153; *cf. United States v. Evans,* 62 F.3d 1233, 1237–1238 (9th Cir.1995) ("the magistrate judge [in

the arresting district] makes the decision whether to hold the person as the proper defendant to answer to the charge, and if so, whether to release him on bail").

This apparent contradiction in case authority has resulted in inconsistent outcomes in this Circuit and elsewhere. For example, one district court relied in part on *Melendez–Carrion* to determine that "the Federal Rules of Criminal Procedure do not *require* the district of arrest to hold a detention hearing before removal" but the district of arrest "may decide to require temporary detention of the defendant during her transfer." *United States v. Murphy,* No. 11–MJ–00615, 2011 WL 5023534, at *3 (S.D.Ind.2011) (emphasis in original). In *United States v. Havens,* 487 F.Supp.2d 335, 338 (W.D.N.Y.2007), a magistrate judge, observing the tension between *Melendez–Carrion* and *El–Edwy,* concluded that the Supreme Court decision in *United States v. Montalvo–Murillo,* 495 U.S. 711, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990) "casts sufficient doubt upon the continuing viability of *Melendez–Carrion* for me to recognize *El–Edwy* as the governing law in this circuit." [2]

An amendment of Federal Rules of Criminal Procedure appears to have resolved the conflict, abrogating the holding of *Melendez–Carrion.* At the time of both *Melendez–Carrion* and *El–Edwy,* initial appearances in multi-district situations were governed by Rule 40, which provided little guidance on the issue of bail determinations in the arresting district. In fact, the only express reference to the issue of a bail hearing in the arresting district was found in Rule 40(c), which directed that "whether the defendant is 'held or discharged, the papers in the proceeding and any bail taken shall be transmitted to the clerk of the district court in which the prosecution is pending.'" *El–Edwy,* 272 F.3d at 152 (quoting pre-amendment version of Federal Rule of Criminal Procedure 40(c)).

In 2002, "as part of a general restyling of the Criminal Rules to make them more easily understood," procedures governed by Rule 40 were "largely relocated" to Rule 5. Fed.R.Crim.P. 40 Advisory Committee Notes, 2002 amends. Rule 5, in turn, was "completely revised," including the addition of subsection 5(c), a "new provision" that "sets out where an initial appearance is to take place." Fed. R.Crim.P. 5 Advisory Committee Notes, 2002 amends. Rule 5(c)(3), entitled "Procedures in a District Other Than Where the Offense Was Allegedly Committed," like Rule 40, is silent on the issue of a bail hearing in the district of arrest, other than preserving the direction that the clerk "must promptly transmit ... any bail to the ... district where the offense was allegedly committed." Fed.R.Crim.P. 5(c)(3)(D). Rule 5(c)(3) sets out a number of provisions uniquely applicable to removal proceedings, including those governing the advice about Rule 20 transfers, the issuance of a warrant from the charging district, the production of a certified copy of the warrant and the identity hearing. *See* Fed.R.Crim.P. 5(c)(3).

At the same time, Rule 5(c)(3) does not include procedures fundamental to an initial appearance, such as advising the defendant about the nature of the charges, his right to counsel, and his right against self-incrimination. These procedures are found in Rule 5(d), entitled "Procedure in a Felony Case." Thus, Rule 5(c)(3) cannot be viewed as all-inclusive of the procedures required at an initial appearance in the

---

**2.** The magistrate judge in *Havens* acknowledged, "[a]lthough the reconciliation of its conflicting opinions might better come from the Second Circuit itself, I am not foreclosed from making the attempt." *Havens,* 487 F.Supp.2d at 338 n. 3.

arresting district, because critical aspects of initial appearance would be omitted. Rather, Rule 5(c)(3) must be read in tandem with the procedures contained in Rule 5(d) to permit the court in the district of arrest to conduct an appropriate initial appearance. Rule 5(d) also requires that "the judge must detain or release the defendant as provided by statute or these rules." Rule 5(d)(1)(3). Accordingly, because Rule 5 now requires a bail hearing in the district of arrest, *Melendez–Carrion* appears to have been abrogated by the 2002 amendment of the Rules.

Case law unambiguously provides that greater deference must be given to detention determinations in the charging district, and, conversely, far less weight should be accorded to determinations rendered in the district of arrest. There are two reasons underlying this sound principle. First, "the orders of detention or conditional release entered by a magistrate judge in the district of arrest are designed to insure the person's appearance in the district where he is wanted-the district where the prosecution is pending [which] has the primary interest in securing his appearance." *El–Edwy*, 272 F.3d at 152–53. Second, "the district of prosecution will have better access to other information that is pertinent to release or detention under § 3142(g), such as the nature and circumstances of the offense, and the weight of evidence against the defendant." *Id.*

The Second Circuit has consistently recognized that the arresting district may be in a stronger position to make a record concerning the defendant's ties to the community in cases, such as this one, in which the defendant resides in that district. In such cases, the Second Circuit has instructed that:

> We recognize that the evidence a defendant might wish to present concerning roots in the community and other factors that might meet the Government's evidence will be more available in the district of arrest whenever he is arrested in the district of his residence.... Where practical, consideration should be given to affording the defendant, arrested in his district of residence, an opportunity in that district promptly to present locally available evidence pertinent to the issue of pretrial release so that a transcript of such evidence can be prepared and furnished to the judicial officer making the detention decision in the district of prosecution.

*Melendez–Carrion*, 790 F.2d at 990; *cf. El–Edwy*, 272 F.3d at 154 ("the district of arrest may, in some circumstances, ensure that the decision lies in a district court having better access to evidence of important factors that govern a bail determination under 18 U.S.C. § 3142(g), such as the defendant's family ties, employment, and community ties"). Thus, the presentations of the parties here were also appropriate for the purposes of creating a record in the district of defendant's residence.

### *The Detention Application*

██ Because the offenses charged do not appear to constitute crimes of violence as defined in the Bail Reform Act, *see* 18 U.S.C. § 3156,[3] the Government is limited to seeking detention under § 3142(f)(2)(B), to the extent it can establish that the defendant "presents a serious risk that [he] ... will ... threaten, injure, or intimi-

---

**3.** As relevant here, the statute requires the actual, attempted or threatened use of physical force. 18 U.S.C. § 3156(a)(4)(A). Although the Affidavit does not specify an express threat of violence, the conduct de- scribed, clearly terrifying for the victims, may even have been perceived by them as an implicit threat of violence, making this a very close call.

date, or attempt to threaten, injure, or intimidate, a prospective witness." [4] Thus, the determination turns on whether the defendant may attempt to threaten or intimidate potential witnesses, which, in this case, means the complaining victims.

Precise prediction of future human conduct represents an impossible task. Here, however, we can look at several indicators. First is the defendant's capacity to threaten or intimidate the victims, both identified and unidentified. According to the Government's proffer, agents uncovered evidence of an Internet cloud storage [5] account that included files bearing names of the victims, presumably containing the photograph files used as part of the extortion. Notwithstanding the seizure of computer hardware from the defendant, the existence of this cloud storage suggests that, based on the information currently available, the defendant has possession of the cache of compromising photos, which can be accessed from any Internet-enabled device on the planet. Though electronic files do not generally constitute dangerous materials, in the context of this highly-unusual case, the defendant effectively "weaponized" these items, presenting a significant risk. Given the defendant's demonstrated facility with computer technology, it would be all but impossible to fashion terms and conditions that would eliminate defendant's access to these materials. Hence, like an individual with access to a secret cache of weapons, the defendant certainly maintains the capacity to intimidate or further injure the victims until these materials can be definitively located and secured.

The second factor is the defendant's willingness to employ these materials to cause further harm to the victims. Of course, that he has done so in the past is one consideration. At the hearing, his counsel argued, persuasively, that the defendant would be a fool to violate a court directive contained in a release order, as it would mean almost certain return to jail. In addition, the mere exposure of the scheme may well make the defendant reticent to engage in additional similar conduct. As Justice Brandeis famously observed, "Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." [6] However, the Government has presented evidence showing that this defendant—largely for reasons that are as yet undiscovered—maintained an animus against some of these victims for many years. Though the defendant is now 21, he has managed to hold a grudge against several victims since high school. This demonstrated drive on the part of the defendant forces me to conclude that there remains a serious risk that he will attempt to intimidate or further injure the victims, as long as those photos remain in his control.

Having concluded there is such a risk, the question is whether there are conditions which can remediate that risk. The Court notes that, at the bail hearing, defendant demonstrated substantial ties to the community. A large number of family members appeared at the bail hearing, representing three generations of his family, all of whom appeared willing and eager to assist in ensuring that the defendant will not engage in further wrongful con-

4. The parties agreed that the defendant did not present a serious risk of flight.

5. "Cloud storage is a service model in which data is maintained, managed and backed up remotely and made available to users over a network (typically the Internet)." *See* http://searchcloudstorage.techtarget.com/definition/cloud-storage.

6. *Buckley v. Valeo*, 424 U.S. 1, 67, 96 S.Ct. 612, 658, 46 L.Ed.2d 659 (1976) (quoting Louis Brandeis, Other People's Money 62 (1933)).

duct. According to his attorney, family members were willing to accompany him to school, attend classes with him, and take any other steps necessary to secure his release. Because of the unique circumstances of this case, I find that this support, though an important consideration, cannot overcome the serious risk of danger to the victims. As such, I directed the defendant be detained pending removal to the Eastern District of Michigan.

That said, I note that this was a close call, which could have easily resulted in a different outcome. As described above, these decisions must be made with deference to the charging district, which will have access to better information concerning the status of the compromising photographs, input from the victims, and the nature of the evidence. That court, therefore, will be in a far better position to evaluate the risk presented by the defendant, and should accord little weight to this determination.

## CONCLUSION

For the reasons set forth herein, the Court directed that the defendant be detained pending his removal to the Eastern District of Michigan, to face the pending charges. This decision is entered without prejudice to a renewed application for release by the defendant in the charging district.

**SO ORDERED.**